**DISTRICT OF COLUMBIA, Petitioner,**

v.

**DISTRICT OF COLUMBIA PUBLIC SERVICE COMMISSION,**
**Respondent,**

and

**Verizon Washington, DC Inc., Intervenor.**

No. 04–AA–1177.

District of Columbia Court of Appeals.

Argued April 14, 2005.
Decided Aug. 10, 2006.

Bennett Rushkoff, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for petitioner.

Christopher G. Lipscombe, Staff Counsel, with whom Richard A. Beverly, General Counsel, was on the brief, for respondent.

Natalie O. Ludaway, Washington, DC, with whom Mary L. Coyne, New York city, was on the brief, for intervenor.

Before RUIZ and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.*

GLICKMAN, Associate Judge:

The issue raised by the present petition for review is whether the District of Columbia Government is entitled to a refund or other retroactive relief from the tariff rate for emergency telephone services that Verizon Washington, DC Inc. ("Verizon") charged it from 2002 to 2004. Two years after Verizon began to charge the tariff rate pursuant to final authorization from the District of Columbia Public Service Commission ("PSC"), the PSC agreed in a new proceeding initiated by the District Government that the rate was unreasonable and needed to be reduced. However, although the PSC thus awarded the District prospective relief, it refused to relieve the District of its obligation to pay Verizon the full tariff rate for the period prior to its decision when the tariff was in force. We affirm the PSC's ruling, because such relief is prohibited by the so-called "filed rate doctrine" and its corollary, the rule against retroactive alteration of established rates.

## I.

### A. Regulatory Background

Since 1996, the PSC has approved a

* Judge Schwelb was an Associate Judge of the court at the time this case was argued. His status changed to that of Senior Judge on June 24, 2006.

series of price cap plans[1] regulating the provision of telecommunications services in the District of Columbia by Verizon or its predecessors. Under the Telecommunications Competition Act of 1996, the PSC is authorized to approve a price cap plan after notice and a public hearing if it finds, *inter alia*, that "[t]he plan is in the public interest," "will produce fair, just, and reasonable rates for telecommunications services," and "does not unreasonably prejudice or disadvantage any customer class or provider of competitive services." D.C.Code § 34–2002(j)(1), (3), (9) (2001).

For pricing purposes, Verizon's services have been grouped in the price cap plans into three categories or "baskets": basic,[2] competitive, and discretionary. As the PSC explains in one of the decisions now before us, basic services are "telecommunications services that are required to make and receive intrastate telephone calls or which are found to be essential by the Commission."[3] Competitive services are "those business services that can be obtained from providers other than Verizon."[4] Discretionary services are a catch-all category, encompassing services that are neither basic nor competitive. While price caps are imposed on basic and discretionary services, no caps are set for competitive services. The premise is that competitive forces in the marketplace will hold down the prices for the latter basket of services. "When a service is classified as competitive, the assumption is that market forces will operate to drive rates down, and thereby restrain the incumbent monopoly from engaging in price gouging." Order No. 13149 at 8.

Unlike other telecommunications services covered by Verizon's price cap plans, Emergency Number 911 ("E911") service has only one customer, the District of Columbia Government. Described by Verizon in its tariff as providing the general public with simple and direct telephone access to the District Government's "public safety answering points," E911 service was originally classified in Verizon's price cap plans as a basic service.

## B. The 2002 Price Cap Plan

On August 16, 2001, Verizon and the Office of People's Counsel ("OPC")[5] peti-

---

**1.** "Price cap regulation imposes a 'cap' on aggregate prices charged ... for certain services in a given area." *WorldCom, Inc. v. FCC*, 345 U.S.App.D.C. 70, 74, 238 F.3d 449, 453 (2001). This form of regulation "offers more pricing flexibility than rate of return regulation, as companies are relatively free to set their own prices so long as they remain below the cap." *Id.* at 75, 238 F.3d at 454.

**2.** In Price Cap Plan 2002, the basic basket was divided into two separate baskets, basic residential and basic business.

**3.** *Formal Case No. 1005, In the Matter of Verizon Washington, D.C. Inc.'s Price Cap Plan 2002 for the Provision of Local Telecommunications Services in the District of Columbia,* Order No. 13149 at 2 (April 1, 2004) (hereinafter, "Order No. 13149").

**4.** Order No. 13149 at 2. To determine whether a service belongs within the competitive basket, the PSC considers whether it meets the following five criteria: (1) the service can be duplicated by customer premises equipment; (2) the service is non-essential; (3) the own-price elasticity of demand (*i.e.,* the responsiveness of consumer demand for the service to changes in its own price) is high; (4) the Herfindhal–Hirshman Index (a measure of market concentration) of the market in which the service is offered is below 1800 (a market with an HHI above 1800 is considered highly concentrated); and (5) the company can show actual losses of revenues attributable to competition. Order No. 13149 at 4–6.

**5.** The OPC is responsible for representing "the people of the District of Columbia" before the PSC. *See* D.C.Code § 34–804(d)(1) (2001).

tioned the PSC to approve a settlement agreement relating to Verizon's proposed 2002 Price Cap Plan. Intended to replace a price cap plan that was due to expire at the end of the year, the proposed plan included three changes relevant to the present proceeding.[6] First, the plan limited annual rate increases for basic and discretionary services to 10% and 15%, respectively. Second, the plan reclassified E911 service from a basic to a competitive service, meaning that the service would no longer be subject to a price cap (or to any limits on rate increases).[7] Third, the plan provided that the parties would be allowed to return to the PSC to request the reclassification of any existing service from one basket to another.

After giving notice in the District of Columbia Register and requesting comments on the proposed plan,[8] the PSC held a public hearing on January 17, 2002. Although the District Government had been a party to the proceedings on Verizon's earlier price cap plans, it did not participate at the hearing on the 2002 plan, and it did not object to the proposed reclassification of E911 service or any other aspect of the plan.[9]

During the public hearing, the PSC questioned the Verizon and OPC representatives about the E911 service. Both parties reiterated their support for moving that service from the basic basket to the competitive basket. Their rationale for the reclassification was twofold. First, Verizon anticipated competition from other telecommunications carriers, to whom Verizon was legally obligated to make available the E911 service components. Verizon's president testified that she was "well aware of one competitor in particular who is extremely interested in providing that service for the District Government," [10] and that there were "certainly other companies capable of providing the service." The OPC representative agreed that E911 service was "fully competitive." Second,

---

**6.** While we focus on those aspects of the 2002 price cap plan that are relevant to this appeal, the plan in its entirety addressed all of Verizon's many telecommunications services, and included rate relief, rate design changes, new services, and substantial contributions by Verizon. To quote from the PSC's summary description in its order approving the plan:

> During Plan 2002's proposed two-year term, residential dial tone line rates would be capped. In addition, Verizon guarantees $5.0 million in direct benefits to District customers through a $1.8 million reduction in residential service connection charges; a $2.0 million residential "Holiday Bonus Credit;" a contribution toward the implementation of 211 service to provide public service information, valued at $300,000; the wiring of one recreational center in each of the District's eight wards, and the furnishing of each center with two computers, valued at $500,000; the establishment of a technology center in Ward 4, valued at $200,000; and the provision and support for a code exhaust stakeholders' task force, valued at $200,000.

*Formal Case No. 1005, In the Matter of Verizon Washington, D.C. Inc.'s Price Cap Plan 2002 for the Provision of Local Telecommunications Services in the District of Columbia,* Order No. 12338 at 3 (February 28, 2002) (footnotes omitted) (hereinafter, "Order No. 12338").

**7.** Strangely, it appears that Verizon and OPC agreed between themselves to reclassify the E911 service without consulting the sole customer for that service, the District Government, about the change.

**8.** *See* 48 D.C.Reg. 10874 (November 30, 2001).

**9.** The only comment received from the District Government, which was submitted by the Director of the Department of Human Services, supported the plan and expressed particular interest in the new 211 public information service.

**10.** This competitor, she added, "has been in a number of conversations with the District Government about providing 911 service."

Verizon expected competition from the District Government itself, which had announced plans to displace Verizon by using its own data network ("DC–Net") and equipment to provide E911 services.

On February 28, 2002, the PSC approved the proposed 2002 Price Cap Plan with only slight modifications. The PSC determined, *inter alia*, that the Plan would "produce rates that are fair, just, reasonable, and nondiscriminatory" and would "not unreasonably prejudice or disadvantage any customer class or provider of competitive services." Order No. 12338 at 14, 15. As neither the District Government nor any other affected entity filed a timely request for reconsideration, the approval of the 2002 Price Cap Plan became final on April 1, 2002.[11]

### C. The District Government's Challenge to the Reclassification of E911 Service

Under the 2002 Price Cap Plan, new tariffs filed by Verizon for competitive services needed no PSC approval, but were to take effect automatically on fourteen days' written notice. To give the requisite notice of the new competitive rate allowed by the Plan's reclassification of E911 service, and to update its description of that service, Verizon filed its Universal Emergency Number 911 Services Tariff with the PSC on May 16, 2002. In this tariff, Veri-

zon announced what was effectively a two-fold increase in its E911 service pricing, from sixteen cents to approximately thirty-two cents per customer line per month. The filing attracted the District Government's attention. On May 31, 2002, it lodged comments on the new tariff with the PSC, asserting, *inter alia*, that the E911 service should not have been classified as competitive because Verizon was the only company that then provided it.[12] Notwithstanding the District's comments, because the E911 service had been transferred to the competitive basket, the rate increase went into effect automatically after fourteen days.

Some three months later, on September 11, 2002, the District formally moved the PSC to reclassify E911 as a basic business service. The PSC eventually held an evidentiary hearing on this motion on October 15, 2003. In advance of this hearing, after soliciting the parties' views, the PSC identified four issues for consideration. Three of the issues pertained to the proper classification of E911 service.[13] The fourth issue had to do with whether any decision by the PSC to return the service to the basic basket should be given retroactive effect—in other words, whether the District Government still would be "obligated to pay the tariff rate for E911 services provided to it by Verizon DC since its

---

11. The District Government could have sought reconsideration even though it was not a party to the proceeding before the PSC, had it wished to do so. *See* D.C.Code § 34–604(b) (2001); *Goodman v. Pub. Serv. Comm'n*, 309 A.2d 97, 100 n. 2 (D.C.1973). However, not having filed a timely application for reconsideration, the District was precluded from appealing the PSC's decision to this court. D.C.Code § 34–604(b) (2001) ("No appeal shall lie from any order of the Commission unless an application for reconsideration shall have been first made and determined.").

12. The District raised other objections that it subsequently abandoned.

13. These issues were: (1) whether E911 service met the PSC's competitive screening criteria; (2) how many suppliers other than Verizon currently were willing and able to provide the service to the District Government at a competitive price; and (3) whether the District was able to arrange for E911 service to be provided by a supplier other than Verizon without unreasonable risk to the reliability of its emergency response system. Order No. 13149 at 4 n. 17.

E911 tariff became effective on May 30, 2002." Order No. 13149 at 4 n. 17.

### D. Decision, Dissent, and Reconsideration

On April 1, 2004, the PSC rendered its decision. Based on findings that Verizon was the District's sole source for E911 service at a competitive price, the PSC agreed with the District that "Verizon's E911 service should not be classified as a competitive service," but rather "should be reclassified and placed back in the basic business basket."[14] Order No. 13149 at 8. Citing D.C.Code § 34–2002(j)(3) and (9), the PSC explained that this reclassification was necessary because, "[i]n the absence of actual competition for E911 service, there are no market forces that would tend to produce fair, just, and reasonable rates or protect the District Government from excessive charges." *Id.*[15]

In accordance with its decision, the PSC suspended Verizon's E911 tariff rate and invited Verizon to propose a lower, reasonable rate to replace it.[16] The suspension was effective only as of the date of the ruling, however. A majority of the PSC rejected the District's argument that the relief should be retroactive, *i.e.*, that the District Government should be relieved of its obligation to pay Verizon the competitive May 2002 tariff rate for E911 service that was provided prior to April 1, 2004. The PSC majority explained that it saw no reason to "depart[ ] from the traditional notion that ratemaking is prospective." Order No. 13149 at 9. Having secured the PSC's final approval of the 2002 Price Cap Plan, which placed E911 service in the competitive basket, Verizon was entitled to initiate the rate increase for that service with no further PSC authorization. And once the new tariff rate took effect, the PSC majority stated, "Verizon had a right to rely on the legality of that rate and levy its charges accordingly." *Id.* at 10 (citing D.C.Code § 34–603 (2001) (providing that all rates and other charges fixed by the PSC "shall be in force and shall be prima facie reasonable until finally found otherwise in an action brought for that purpose")). Therefore, the majority concluded,

> [w]e cannot use our subsequent determination that the E911 service should be reclassified as a basis for rendering the filed rate illegal because to do so would violate the well-settled prohibition against retroactive ratemaking. [Cita-

Order No. 13149 at 7–8 (footnotes omitted).

---

14. In brief summary, the PSC was persuaded that

> the District of Columbia has met its burden in proving that there is no other supplier other than Verizon that is currently willing and able to provide the District Government, at a competitive price, with the E911 services that Verizon currently provides the District; that there are no CPE [Customer Premises Equipment] alternatives currently available that the District could turn to for [ ] "functionally equivalent" E911 services; that the District Government currently is unable to arrange for a supplier other than Verizon to provide the E911 service that Verizon currently provides the District Government; and therefore, Verizon's E911 service should not be classified as a competitive service under Price Cap Plan 2002.

15. "Without those market forces," the PSC elaborated,

> the monopolist can charge an excessive rate and the customer can be forced either to pay it or forego the service. Obviously, the latter alternative is not an option because E911 service is essential to public safety. In our view, this is exactly the kind of overreaching by monopolies that the law expects us to guard against.
>
> *Id.*

16. This new rate would be subject to the ten percent ceiling on annual rate increases for basic services.

tion omitted.] Relief is prospective, only. Therefore, the District is obligated to pay the tariff rate under Verizon's May 2002 E911 tariff up until the date of this Order. *Id.* at 10.

One member of the PSC, Commissioner Rachal, dissented from the determination that the District Government remained subject to the competitive tariff rate for the E911 service that it had received prior to April 1, 2004. The dissent argued that the PSC's initial decision of February 28, 2002, approving the 2002 Price Cap Plan was "invalid," because it was a mistake *at that time* to classify E911 service as competitive.[17] "[C]onsequently," the dissent reasoned, "the competitive rates that were charged for this service from that time to date are also invalid. Neither the majority nor Verizon can rely on a tariff that was illegal and implemented under erroneous conclusions." *Id.*, Dissent at 5.

On reconsideration, over Commissioner Rachal's continuing dissent, the PSC majority adhered to its decision that the reclassification of E911 service as a basic business service entitled the District Government to "prospective relief only."[18] The majority articulated the core of its rationale as follows:

> The filed rate doctrine and its corollary, the rule against retroactive rate making, bars this Commission from retroactively substituting what we perceive

as an unreasonably high or low rate with one that we perceive is just and reasonable. The filed rate doctrine forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate regulatory authority. The related rule against retroactive rate making prohibits the regulatory authority from adjusting current rates to make up a utility's overcharge or undercollection in prior periods. By authorizing only prospective rate changes, these doctrines ensure rate predictability ..., and by preventing discriminatory pricing, they promote equity....

Order No. 13258 at 6–7 (footnotes and citations omitted). In addition, the PSC majority noted, "Price Cap Plan 2002 does not provide for, nor did we issue, any statement notifying interested parties that Verizon's E911 rate was provisional or otherwise subject to later revision." *Id.* at 6 (footnotes and internal quotation marks omitted).[19] Thus, by failing to file a petition for reconsideration of the Order approving the 2002 Price Cap Plan, the District Government had "missed its opportunity to stay the effectiveness of Verizon's E911 tariff...." *Id.* at 4.[20]

## II.

Echoing Commissioner Rachal's dissent, the District argues that the classification of E911 service as competitive in the 2002

---

17. In contrast, the PSC majority observed that "the District has not argued that our earlier order, approving the settlement agreement for the 2002 Price Cap Plan, was erroneous nor have we made such a determination." *Id.* at 9 n. 38.

18. *Formal Case No. 1005, In the Matter of Verizon Washington, D.C. Inc.'s Price Cap Plan 2002 for the Provision of Local Telecommunications Services in the District of Columbia,* Order No. 13258 at 7 (July 30, 2004) (hereinafter, "Order No. 13258").

19. Commissioner Rachal rejoined that "[t]he parties received such notice on the date of the District Government's filing for reclassification of E911 service." *Id.*, Dissent at 3.

20. The PSC majority also reiterated that its approval of the District Government's reclassification petition did not constitute a determination that its earlier approval of the 2002 Price Cap Plan was erroneous. *Id.* at 6.

Price Cap Plan was unlawful from the outset, and that the PSC therefore could and should have ordered retroactive rate relief to remedy its legal error in approving that classification. Accordingly, the District asks us to vacate the portions of the PSC's orders refusing to relieve the District from its obligation to pay the full tariff rate under Verizon's May 2002 E911 tariff up until April 2004, and to direct the PSC to exercise its discretion on remand to consider granting retroactive rate relief after determining what a "fair, just, and reasonable" rate would have been.[21]

■■■ We think that the District's argument is unsound, and not merely because we employ a deferential standard of review in considering challenges to PSC orders.[22] We reject the District's argument for the same reason that the PSC majority did, namely, because the argument is foreclosed by the so-called filed rate doctrine and its corollary, the prohibition against retroactive alteration of established rates.

■■■ "The filed rate doctrine 'forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate ... regulatory authority.'" *Watergate East, Inc. v. Pub. Serv. Comm'n*, 662 A.2d 881, 888 (D.C. 1995) (quoting *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981)). The doctrine protects the ability of both a utility and its customers "to rely on filed rates until they are formally changed." *OXY USA, Inc. v. FERC*, 314 U.S.App. D.C. 175, 194, 64 F.3d 679, 698 (1995). In the District of Columbia, the filed rate doctrine is statutorily mandated. D.C.Code § 34-603 provides that "[a]ll rates ... fixed by the

---

21. Respondents contend that the District's present argument is statutorily barred because the District failed to make it in its application for reconsideration with the PSC. *See* D.C.Code § 34-604(b) (providing, *inter alia*, that an application for reconsideration before the PSC must "stat[e] specifically the errors claimed as grounds for ... reconsideration" and that "[n]o public utility or other person or corporation shall in any court urge or rely on any ground not ... set forth in said application"); *District of Columbia v. Pub. Serv. Comm'n*, 802 A.2d 373, 382 n. 15 (D.C. 2002). Specifically, the District did not expressly claim in its application for reconsideration that the PSC had erred in 2002 when it approved the reclassification of E911 service as competitive. The District did assert, however, that Verizon's May 2002 tariff was "unlawful" and an "error." Reading those assertions in conjunction with Commissioner Rachal's initial dissent, we are persuaded that the District did preserve its argument for review in this Court. *See Washington Gas Light Co. v. Pub. Serv. Comm'n*, 483 A.2d 1164, 1168 n. 11 (D.C.1984) ("While a truly persuasive application might [have] state[d] more than [the District's] did, another restatement of its position would have served little purpose in this instance.").

22. "In the determination of any appeal from an order or decision of the Commission the review by the Court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." D.C.Code § 34-606 (2001). "While we do not give the PSC's legal conclusion the same deference owed factual determinations, we nonetheless will sustain it if it is reasonable and based upon factors within the Commission's expertise." *District of Columbia v. Pub. Serv. Comm'n*, 802 A.2d at 376 (internal citation and quotation marks, brackets and ellipses omitted). To permit meaningful judicial review, we require the PSC to explain its actions "fully and clearly." *Id.* (citation omitted). If the PSC has done so, a petitioner challenging its decision—particularly a decision pertaining to rate making—then must carry "the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken." *Id.* (citation omitted). "Indeed, we have repeatedly characterized our review of PSC orders as 'the narrowest judicial review in the field of administrative law.'" *Id.* at 376-77 (citations omitted).

Commission shall be in force and shall be prima facie reasonable until finally found otherwise in an action brought for that purpose." D.C.Code § 34–1123 (2001) similarly provides, *inter alia*, that the rates properly filed by a public utility with the PSC "shall be the lawful rates ... within the District of Columbia, and shall remain and be in force until set aside by the Commission." And D.C.Code § 34–1129 (2001) states in pertinent part that "[i]t shall be unlawful for any public utility to charge, demand, collect, or receive a greater *or less* compensation for any service performed by it within the District of Columbia ... than is specified" in its filed rate schedules "as may at the time be in force, or to demand, collect, or receive any rate ... not specified in such schedules." (Emphasis added.) The filed rates "shall be the lawful rates ... until the same are changed...." *Id.* The "core purpose" of the filed rate doctrine is "to insure the 'predictability' of rates and prevent 'unforeseeable liabilities' on the part of utilities and purchasers." *Watergate East*, 662 A.2d at 889 (citation omitted).[23]

 A corollary of the filed rate doctrine prohibits the regulatory agency—in the present case, the PSC—from altering rates retroactively. "This rule bars the ... retroactive substitution of an unreasonably high or low rate with a just and reasonable rate." *Ark. La. Gas Co.*, 453 U.S. at 578, 101 S.Ct. 2925 (internal quotation marks and citations omitted).[24] And an agency is precluded "from doing indirectly what it cannot do directly." *Towns of Concord*, 293 U.S.App. D.C. at 378, 955

F.2d at 71 n. 2. (quoting *Assoc. Gas Distribs. v. FERC*, 283 U.S.App.D.C. 212, 213, 898 F.2d 809, 810 (1990) (per curiam) (Williams, J., concurring)). Thus, "in particular, [a regulatory agency] may not order reparations." *Ark. La. Gas Co.*, 453 U.S. at 578 n. 8, 101 S.Ct. 2925. As the Supreme Court held in *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), once a regulatory body has authorized a public utility to charge a particular rate, having found that rate to be reasonable, it may not require the utility to *pay refunds to its customers* based on its subsequent finding that the rate was excessive—even if it concludes that it made an error when it approved the rate in the first place. In *Arizona Grocery*, the Interstate Commerce Commission (ICC) had approved a ceiling of 96.5 cents per hundred pounds for the rates charged by railroads to ship sugar from California to Arizona. In compliance with that ruling, the carriers charged rates of 86.5 cents and 84 cents. When the shippers thereafter challenged those rates, the ICC found them unreasonable insofar as they exceeded 71 to 73 cents and ordered the railroads to *refund the difference.* The Supreme Court held the *refund order improper:*

> Where the Commission has, upon complaint and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, sub-

---

**23.** Other justifications for the filed rate doctrine include preserving the regulatory agency's primary oversight authority and preventing rate discrimination. *See Towns of Concord, Norwood, & Wellesley, Mass. v. FERC*, 293 U.S.App. D.C. 374, 378, 955 F.2d 67, 71 (1992).

**24.** Similarly, "[t]he rule against retroactive rate increases prohibits the [regulatory agency] from adjusting current rates to make up for a utility's over- or undercollection in prior periods." *Towns of Concord, et al.*, 293 U.S.App. D.C. at 378, 955 F.2d at 71 n. 2.

ject a carrier which conformed thereto to the payment of reparation measured by what the Commission now holds it should have decided in the earlier proceeding to be a reasonable rate.

*Id.* at 390, 52 S.Ct. 183. *Accord, Verizon Tel. Cos. v. FCC,* 348 U.S.App. D.C. 98, 107, 269 F.3d 1098, 1107 (2001) (*"Arizona Grocery* has been and should be understood ... as a proscription against the retroactive revision of established rates through ex post reparations.") (citing cases).

▮ The linchpin of the District's request for retroactive relief from Verizon's authorized tariff rate for E911 service is that the rate was illegal from the outset because the PSC erred in approving the reclassification of E911 service in the competitive basket. But under *Arizona Grocery* and its progeny, that putative error [25] is not a reason to order a refund or other retrospective remedy. Indeed, "the rule against retroactive ratemaking is premised on the implicit understanding that an established rate is not made *illegal* if it is later found to be impermissible or unreasonable." *Verizon Tel. Cos.,* 348 U.S.App. D.C. at 107, 269 F.3d at 1107 (citing cases).[26]

Nevertheless, the District argues that the PSC has the discretionary authority to order a refund because "[a]n agency, like a court, can undo what is wrongfully done by virtue of its order." *United Gas Improve-*

---

**25.** Parenthetically, we think it fair to observe that the District's position is questionable on its own terms. Substantial evidence in the record of the proceedings before the PSC on the proposed 2002 Price Cap Plan supported the reclassification of E911 service as competitive, and "an 'error in judgment' by the regulatory body .... does not rise to the level of an error of law." *United States v. Pub. Utils. Comm'n,* 81 U.S.App.D.C. 237, 240, 158 F.2d 533, 536 (1946). Moreover, though we express no opinion on the question, it is arguable that the PSC had latitude under the statute to approve the settlement agreement reached by Verizon and OPC without having to find that each of the numerous telecommunication services covered by the agreement was properly classified. *See* D.C.Code § 34–2002(j)(2) ("nothing in this subsection shall prohibit the Public Service Commission from implementing any settlement arrived at in respect to a formal case in process, or any future case, so long as such settlement establishes tariffs that are not inconsistent with the requirements of the federal Telecommunications Act").

It is not suggested, and we have no reason whatsoever to think, that the PSC's original approval of the classification of E911 service was procured by fraud. We express no opinion as to the applicability of the filed rate doctrine to the PSC's remedial powers in such a case.

**26.** *See also United States v. Pub. Utils. Comm'n, supra* note 25, in which the United States challenged a rate order in its capacity as a consumer. In rejecting that challenge, the Circuit Court concluded as follows:

The foundation upon which all the argument of the United States rests is its contention that, throughout the many years during which the sliding scale arrangement has been in effect, the rates have been excessive and illegal. Each year, however, the rates were fixed by an order of the Commission. The Act permits any person affected by a final order of the Commission to appeal to the District Court for a review, such action to be taken within sixty days after the Commission's denial of his application for reconsideration. The annual orders which fixed the rates became final and conclusive when no person affected thereby availed himself of the right of appeal. Consequently the rates so fixed became the legal rates for the periods during which they were to endure, and neither the United States nor any other party affected thereby can brand them as illegal. All the arguments of the government, being based on the mistaken idea that the orders made by the Commission in past years can be attacked now, must be rejected because of the failure of their foundations, as well as for the other reasons heretofore stated.

*Id.* at 241–42, 158 F.2d at 537–38 (footnote omitted).

*ment Co. v. Callery Props., Inc.*, 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965). But the District takes this statement out of context and misunderstands its import. In *Callery*, the Supreme Court merely held that even though a regulatory agency may have no power to make reparation orders, it still may order a refund on remand to effectuate an appellate court reversal of its original rate order, "which never became final." *Id.* As the Court explained, "[h]ere the original ... orders were subject to judicial review; and judicial review at times results in the return of benefits received under the upset administrative order. [Citation omitted.] An agency, like a court, can undo what is wrongfully done by virtue of its order." *Id.* In short, *Callery* simply illustrates "the general principle of agency authority to implement judicial reversals." *Natural Gas Clearinghouse v. FERC*, 296 U.S.App. D.C. 104, 111, 965 F.2d 1066, 1073 (1992); *accord, Verizon Tel. Cos.*, 348 U.S.App. D.C. at 111, 269 F.3d at 1111. *Callery* thus lends no support to the District's position in this case, for the PSC's approval of the 2002 Price Cap Plan was a final order that was not subjected to judicial review or reversed on appeal.

■ In seeking a refund back to the date on which it filed its comments objecting to Verizon's E911 service tariff, the District also argues that the filed rate doctrine and the rule against retroactive alteration of established rates "have little or no force when the party claiming reliance [*i.e.*, in this case, Verizon] has been on notice that the existing rate is subject to change depending on how a legal dispute is ultimately resolved." This proposition is stated too broadly to be correct;

the filing of a belated challenge to an established, final rate is not enough to trigger a curtailment of the statutory rule that filed rates remain in force until they are "finally" replaced. D.C.Code § 34–603. Rather, it is when the parties are placed on notice *from the outset*—typically by the regulatory body itself when it approves the rate in question—that the rate is not a final rate, but rather is subject to adjustment based on the future "resolution of some specific issue," *Natural Gas Clearinghouse*, 296 U.S.App.D.C. at 113, 965 F.2d at 1075, that the filed rate doctrine does not apply:

> Notice does *not* relieve the [regulatory body] from the prohibition against retroactive ratemaking. Instead, it changes what would be purely retroactive ratemaking into a functionally prospective process by placing the relevant audience on notice at the outset that the rates being promulgated are provisional only and subject to later revision. This in no way dilutes the general rule that once a rate is in place with ostensibly full legal effect and is not made provisional, it can then be changed only prospectively.

*Columbia Gas Transmission Corp. v. FERC*, 282 U.S.App.D.C. 386, 392, 895 F.2d 791, 797 (1990) (emphasis in original). The *Callery* principle discussed above is really just an instance of this general proposition. Correctly stated, the notice principle is of no benefit to the District in this case, for there was nothing provisional about the PSC's approval of the 2002 Price Cap Plan or Verizon's E911 service tariff.[27]

### III.

For the foregoing reasons, we conclude that the PSC did not err in rejecting the

---

**27.** The fact that the Plan contemplated that the parties would be free to return to the PSC to request that particular telecommunication services be reclassified did not mean that the placement of E911 service in the competitive basket was "provisional" within the meaning of the principle discussed above. Nor did the Plan remotely suggest that retroactive relief would be available in the event of such a future reclassification.

District's request for retroactive relief from Verizon's May 2002 tariff rate for E911 services. Accordingly, PSC Order Nos. 13149 and 13258 in Formal Case No. 1005 are hereby affirmed.