**OFFICE OF PEOPLE'S COUNSEL,**
Petitioner,

v.

**D.C. PUBLIC SERVICE COMMISSION,**
Respondent

and

**Potomac Electric Power Company,**
Intervenor.

**No. 08–AA–947.**

District of Columbia Court of Appeals.

Argued March 12, 2009.
Decided Feb. 18, 2010.

Brian O. Edmonds, with whom Elizabeth A. Noel, Sandra Mattavous–Frye, John Michael Adragna, Barry Cohen, and Joanne Doddy Fort were on the brief, Washington, for petitioner.

Christopher G. Lipscombe, with whom Richard Beverly and Richard Herskovitz were on the brief, for respondent.

Nicholas S. Penn, with whom Kavita Aildasani, Kirk J. Emge, Washington, Deborah M. Royster, Anthony C. Wilson, and Keith Townsend were on the brief, for intervenor.

Before RUIZ and BLACKBURNE–RIGSBY, Associate Judges, and FERREN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

This petition filed by the Office of People's Counsel (OPC) seeks review of two components of an order (No. 14712)[1] issued by the Public Service Commission ("PSC" or the "Commission") approving an increase in Potomac Electric Power Company's ("Pepco") distribution service rates. The first component of OPC's petition relates to Pepco's Supplemental Executive Retirement Plan and Executive Benefit Protection Plan (collectively, "SERP"). The Commission excluded capitalized SERP costs from Pepco's rate going forward, but rejected, as retroactive ratemaking, the OPC's request to make Pepco refund the portion of SERP costs capitalized since an earlier decision by the PSC in 1995 (Formal Case No. 939, or "FC–939"). The OPC contends that the Commission erroneously applied the rule against retroactive ratemaking because all it seeks to recoup from Pepco are costs which, OPC maintains, the Commission disallowed in its 1995 decision.

The second component under review concerns the Commission's determination that Pepco could properly include in its rate base the costs of the new Northeast Substation that are allocable to the District of Columbia. The OPC contends that the Commission erred in not making a corresponding adjustment based on Pepco's expected revenue to account for load growth (essentially, new customers served and revenue gained) by the Northeast Substation.

As these contentions are conceptually and factually distinct, we discuss them separately in the two parts of this opinion. We affirm the PSC's decision as to both matters.

I.

At issue in FC–939, in 1995, was a request by the OPC for the Commission to disallow, in computing Pepco's rate base, so-called expensed SERP costs.[2] Significantly, however, in that case, the OPC did not ask for a reduction in *capitalized* SERP costs. The Commission disallowed $231,000 in costs associated with SERP, and thereafter, Pepco filed documents with the Commission reflecting that it had removed the SERP expensed costs from the rate base (but capitalized costs were not included in the reduction). Well over a decade later, the OPC challenged this selective reduction in partly opposing Pepco's requested increase in rates in the present case. It argued to the PSC, and now argues to this court, that the 1995 ruling by its terms had disallowed "all" SERP costs, which, it reasons, must have included both expensed and capitalized costs.

---

1. To be clear, while the petitioner technically challenges Order No. 14832, that order merely denied petitioner's motion for reconsideration of Order No. 14712, which we reference above because it explains more fully the reasoning behind the findings that are challenged here.

2. SERP costs, like other personnel costs of Pepco, are. allocated to individual projects. Based on the nature of the project and its treatment for accounting purposes, the costs are either capitalized (*i.e.*, spread over a multi-year period) or expensed (*i.e.*, recovered in a single year).

■ In response to the OPC's request, the Commission did two things. First, it determined that its "reasoning" in the earlier case "applies to all SERP costs," and ruled accordingly that, going forward, it would remove the entire amount of SERP costs (not just the expensed portion) from Pepco's proposed rate base—which resulted in a reduction in this case of $289,000.[3] But second, it refused to order a further reduction reflecting the aggregate capitalized SERP costs that Pepco had carried on its books since the decision in FC–939, because while that decision had disallowed "all" SERP costs, capitalized costs had not been an issue before it in that proceeding or a subject of its ruling, and so Pepco could have properly continued to include them in its rate base during the interim period. Moreover, Pepco had included these costs in its "compliance filing[s]" for those years without objection by any party. In these circumstances, the PSC concluded that disallowing the past capitalized SERP costs now would amount to retroactive ratemaking, which is prohibited by "the … filed rate doctrine and its corollary, the prohibition against retroactive alteration of established rates." *District of Columbia v. District of Columbia Pub. Svc. Comm'n*, 905 A.2d 249, 256 (D.C. 2006).

■ We find no basis on which to disturb this ruling. The premise of the OPC's position—that the Commission disallowed the capitalized portion of Pepco's SERP costs in the 1995 decision—runs contrary to the PSC's determination that, as the issue in that case only concerned SERP expensed costs, it had decided nothing with respect to capitalized costs. We

fail to see why the PSC was not the best judge of the scope of its ruling in that matter, and accordingly why it could not fairly conclude—as it did—that Pepco had justifiably relied on the limited scope of that decision in continuing to carry the capitalized costs on its books and include them in its rate base until instructed otherwise. The ban against retroactive ratemaking protects a utility from being penalized for justifiable reliance of that sort, thereby "insur[ing] the predictability of rates and prevent[ing] unforeseeable liabilities on the part of utilities and purchasers." *District of Columbia, supra,* 905 A.2d at 257 (citation and internal quotation marks omitted); *see also id.* ("[O]nce a regulatory body has authorized a public utility to charge a particular rate, … it may not require the utility to pay refunds to its customers based on its subsequent finding that the rate was excessive—even if it concludes that it made an error when it approved the rate in the first place.").

Moreover, as the Commission points out in its brief, following the decision in FC–939, Pepco made "compliance filing[s]" with the PSC, *see generally People's Counsel v. Pub. Svc. Comm'n,* 462 A.2d 1105, 1113–15 (D.C.1983), reflecting that it had removed the SERP expensed costs from its rate base, and the OPC did not object in a timely manner (as required by 15 DCMR § 296.3 (1998)) regarding Pepco's failure to remove the capitalized costs as well. Instead, the OPC waited more than ten years before now insisting that the accumulated costs should be used to further reduce Pepco's rate base beyond the amount that the Commission has ordered.[4]

---

3. The PSC reiterated its reasoning in the earlier case that "if [Pepco] wishes to compensate it executives over and above its qualified pension plan, then this cost is properly borne by the shareholders, not the ratepayers."

4. Notably, the OPC does not claim that Pepco was "hiding the ball" or that its compliance filings somehow disguised the fact that its base rate still included capitalized SERP costs. Instead, the OPC merely counters that "it was the statutory obligation of the Com-

Mindful of the broad deference we owe Commission rulings regarding rates, *see* D.C.Code § 34–606 (2001), and the strictures of the ban on retroactive ratemaking, we do not think the PSC erred in refusing to order the retroactive removal sought by the OPC.

In its reply brief, the OPC contends that its position has been misunderstood—that it is "not here seeking to adjust a past rate or to require funds collected under past rates [to] be refunded"—because it is seeking "an adjustment applicable to prospective rates only[.]" But despite invoking the distinction between a (permissible) "prospective" rate adjustment and a forbidden "retroactive" one, it is clear from its briefs that the OPC seeks the "remov[al]" from Pepco's rate base of the capitalized SERP costs "that [Pepco] has improperly accumulated on its books since the Commission's Order in [FC–939] was issued"; in other words, the OPC argues that the "profits" that Pepco gained through including in its rate base certain costs that the PSC had "disallowed" in 1995 should be returned to the ratepayers by a corresponding reduction in the rate base "going forward." That obviously is meant to be an amount well in excess of the $298,000 reduction that the PSC ordered here (one that assumed no impropriety in Pepco's past treatment of SERP costs); otherwise, there would be no reason for the OPC's challenge. We find no error in the Commission's application of principles concerning retroactivity, or its

refusal to order recoupment of costs that Pepco had included in its base before the present 2008 order.

## II.

■■ The OPC does not challenge the PSC's overall decision to approve an out-of-test period rate adjustment to reflect the costs of Pepco's new Northeast Substation allocable to the District of Columbia during the effective period of the rates.[5] The OPC claims, however, that the Commission erred by not including in the rate determination a corresponding adjustment of Pepco's revenues to reflect future load growth that will be met by the Substation, and thus additional revenues Pepco will gain. We have said that "the burden of justifying an out-of-period adjustment is on the party seeking the adjustment" *Office of People's Counsel v. Pub. Serv. Comm'n,* 610 A.2d 240, 247 (D.C.1992). The Commission rejected the OPC's contention that the costs Pepco asked to be included in its rate base pertained to the future load growth capacity of the Northeast Substation; rather, in the Commission's view, Pepco's proposed rate adjustment related to those portions of the project intended to provide electric capacity for the existing load, and thus ensure reliability for a system that would otherwise be overloaded. In short, the PSC found that the OPC had not met its burden to show why potential revenues

mission, not OPC, to ensure that [Pepco's] filed rates were consistent with [FC–939]."

5. An "out-of-test period" revenue adjustment refers to an adjustment to reflect developments that occurred after the "test period." The "test period" is a twelve-month period over which the utility's revenues are compared to its costs to determine whether the utility is earning a fair rate of return; if not, the utility has established a right to increase its rates to have an opportunity to earn a fair

rate of return prospectively. *See generally Washington Pub. Interest Org. v. Pub. Serv. Comm'n,* 393 A.2d 71, 74 n. 2 (D.C.1978). The PSC also generally considers evidence that the amount of the rate increase should be adjusted up or down to reflect "known and measurable" changes that are likely to occur in the period immediately following the test year. Those changes are sometimes referred to as "out-of-test-period" adjustments.

from the substation, as it serves load growth in the future, should be included in the determination of Pepco's present rate base. On the record before us, we have no reason to disturb that conclusion.

Among other evidence, the Commission heard testimony that without new capacity, two existing substations and two feeder network groups would be overloaded, posing reliability risks.[6] The OPC responds that this same evidence, particularly Cross Examination Exhibit 14,[7] showed that the anticipated stress on electric capacity stems from future growth—new load—and thus that failure to "make a corresponding adjustment to revenues [from the new load] would create a mismatch between costs underlying, and revenues to be produced by, Pepco's proposed rates[.]" But this seems to us to present a classic matter of judgment for the Commission as to whether the new substation—and the associated costs sought to be included in the rate base—was designed to address existing overload conditions, or whether it was an investment in future growth designed to meet new demand (which would predictably yield new revenues to offset costs). We do not understand the Commission's ruling to preclude future adjustment of Pepco's rates to account for revenues generated by new load as the Northeast Substation is progressively placed into service.

But what the record does not allow us to do is fault the Commission's judgment, one particularly dependent on its unique expertise, see *Washington Gas Light Co. v. Pub. Serv. Comm'n*, 450 A.2d 1187, 1193 (D.C.1982), that the costs being considered were necessary to address the present reliability of the distribution system and not an advance collection or recoupment of future costs for which a determination of offsetting revenue also had to be made.

### III.

For the reasons explained more fully herein, we find no reason to disturb the PSC's decision that the OPC has challenged here. Accordingly, the PSC's Order No. 14832 is hereby

*Affirmed.*

---

6. For example, one of Pepco's witnesses testified that:

> [T]he vast majority of the District ... is either above a 90% substation capacity utilization or has reached the 100% capacity utilization while serving existing electric load. As mentioned above, Pepco has exhausted the options to increase available capacity through load transfers from substations with remaining available capacity....
>
> The risk of operating with these overloads in place is that we will be forced to operate outside of the N–1 design criteria. This means that in the event of a single contin-

gency (loss of transformer, feeder, bus section, etc.), the remaining equipment would be overloaded to the point that Pepco would have to shed customer load immediately or risk permanently damaging or destroying electric system equipment should that event continue or an additional failure occur. Such events can also lead to a catastrophic failure, extensive customer outages and present unacceptable safety conditions to customers and the general public.

7. This was a document prepared by Pepco that included its forecast for its substation and feeder loads for the years 2007 through 2016.