DISTRICT OF COLUMBIA, District of Columbia Water and Sewer Authority, Petitioners,

v.

PUBLIC SERVICE COMMISSION OF the DISTRICT OF COLUMBIA, Respondent.

Office of the People's Counsel and Potomac Electric Power Company, Intervenors.

Nos. 01–AA–430, 01–AA–432.

District of Columbia Court of Appeals.

Argued Jan. 22, 2002.
Decided July 11, 2002.

Robert I. White, with whom Nancy A. White, Iain R. McPhie and Henderson J. Brown, IV, Washington, DC, were on the brief, for petitioner District of Columbia Water and Sewer Authority.

Edward E. Schwab, Assistant Corporation Counsel, with whom Robert R. Rigs-by, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for petitioner District of Columbia.

Timothy Robinson, with whom Sheila S. Hollis and Christopher W. Mahoney, Washington, DC, were on the brief, for respondent.

Nicholas S. Penn, with whom Nicole C. Mason, Kirk J. Emge and Paul H. Harrington, Washington, DC, were on the brief, for intervenor Potomac Electric Power Company.

Sandra Mattavous–Frye, with whom Elizabeth A. Noel, James Byrd, Washington, DC, and Milton Grossman were on the brief, for intervenor Office of the People's Counsel of the District of Columbia.

Before STEADMAN, RUIZ and WASHINGTON, Associate Judges.

STEADMAN, Associate Judge.

The District of Columbia has embarked upon the deregulation of its electricity market. Once the market is deregulated, customers will be able to purchase electricity from various suppliers, but they will receive their electricity through Potomac Electric Power Company's ("PEPCO") distribution system. As a result, the rates charged for electricity must be unbundled to reflect the separate costs of the electricity and its transmission and distribution. The Public Service Commission ("PSC") in Orders No. 11845 and 11926 approved a Non–Unanimous Agreement of Stipulation and Full Settlement Regarding Unbundled Rate Issues ("Settlement") that set these initial unbundled rates.

Petitioners District of Columbia Water and Sewer Authority ("WASA") and the District of Columbia government ("DCG")[1] have challenged these orders as

---

1. WASA is a "corporate body ... that has a     separate legal existence within the District

unreasonable, arbitrary or capricious.[2] Although petitioners raise a number of claims, we focus primarily on their arguments that PSC failed to examine issues it promised to resolve during the unbundling proceeding, unreasonably struck from the record large portions of their joint testimony, and erred when it concluded that, as provided in the Settlement, the rates should be unbundled in a revenue neutral manner.[3] We affirm the PSC orders on all challenged grounds.

## I.

In 1999, the Council of the District of Columbia enacted legislation that allowed for the implementation of retail competition in the D.C. electricity market. *See Retail Electric Competition and Consumer Protection Act of 1999*, D.C. Law 13–107, 47 D.C.Reg. 1091 (2000) (codified at D.C.Code §§ 34–1501 *et seq.* (2001)). In Phase I of the proceedings related to initiating retail competition, PSC approved a Non–Unanimous Agreement of Stipulation and Full Settlement ("Phase I Settlement") that permitted PEPCO to sell its generation assets. *See Moore Energy Resources, Inc. v. Pub. Serv. Comm'n*, 785

A.2d 300, 302–03 (D.C.2001).[4] As part of the Phase I Settlement, PSC called upon the parties involved to reach agreement on the unbundled rates that would be in effect following PEPCO's divestiture of its generation assets. Order No. 11576 at 63, 1999 WL 1581583 (Dec. 30, 1999). However, the parties were unable to reach a settlement by the deadline of February 1, 2000. As a result, PSC initiated Phase II to determine PEPCO's post-divestiture unbundled rate structure. Order No. 11613 (Feb. 17, 2000). PEPCO filed its unbundled rate proposal on February 29, 2000. Subsequent to that filing, several parties filed comments, proposed issues and/or proposed procedural schedules regarding the proposal.

PSC then issued an order designating the Phase II issues and procedural schedule. Order No. 11673, 2000 WL 667369 (Apr. 26, 2000). However, when several of the parties to the Phase II proceeding notified PSC that a settlement was possible, PSC suspended the procedural schedule. Order No. 11713 (June 15, 2000). A proposed settlement was filed on June 30, 2000.[5]

government," D.C.Code § 34–2202.02(a) (2001), including the capacity to sue and be sued in its own name. D.C.Code § 34–2202.03(1). Because "WASA's operations are energy intensive, particularly those of its water and sewer pumping stations and the Blue Plains Wastewater Treatment Plant[,] WASA has a substantial economic interest in any proceeding concerning [PEPCO's] rates to District electric customers[.]" Its functions related to public health must be in continuous operation and most of its power is generated directly across the Potomac River from Blue Plains. DCG's interest in the proceedings stems from its general desire to protect the interests of all District ratepayers as well as its specific duty to represent the concerns of government entities who purchase electricity.

2. Intervenors Office of the People's Counsel ("OPC") and PEPCO both support the PSC decisions.

3. When rates are unbundled in a revenue neutral manner, the percentage of total revenues per customer class does not change.

4. In *Moore Energy Resources, supra,* we remanded a case arising out of the Phase I proceeding so that PSC could explain more fully its conclusion that the Small Business Act, 15 U.S.C. §§ 631, 637(d) (2000), did not apply to the settlement for PEPCO's proposed sale of assets. *See* 785 A.2d at 308–09.

5. The parties joining in the proposed settlement were PEPCO, OPC, Washington Gas Light Company, the Apartment and Office Building Association of Metropolitan Washington, the Consumer Utility Board, the General Services Administration, the International Brotherhood of Electrical Workers, and the Washington Metropolitan Area Transit Authority.

WASA and DCG soon thereafter filed comments opposing the proposed settlement. PSC directed that the parties submit testimony regarding the Settlement and set a hearing for September 11, 2000 to determine if the Settlement was in the public interest. Order No. 11746, 2000 WL 1341269 (Aug. 9, 2000). A few days before the Settlement hearing, PEPCO and OPC each filed motions to strike a large part of the joint testimony submitted by WASA/DCG witness Raymond Petniunas, arguing that many portions dealt with issues that were irrelevant to the Settlement and/or already resolved by prior proceedings. After hearing arguments on the motions to strike on September 11, 2000, PSC agreed with PEPCO and OPC and struck most of Petniunas' testimony from the record. PSC then continued with the Settlement hearing, which involved cross-examination of various witnesses on previously submitted testimony.

On December 5, 2000, PSC issued an order approving the Settlement in which it found that the Settlement was in the public interest and that each article of the Settlement should be adopted. Order No. 11845, 2000 WL 1911404. The day before, PSC had denied WASA and DCG's joint application for reconsideration of PSC's decision to strike most of Petniunas' testimony. Order No. 11851, 2000 WL 1911403 (Dec. 4, 2000). WASA then applied for reconsideration of Order No. 11845. PSC rejected this application, reiterating that the Settlement was in the public interest. Order No. 11926, 2001 WL 242194 (Feb. 20, 2001). WASA and DCG filed petitions for review of Orders No. 11845 and 11926 with this court.[6]

## II.

■ We recently had occasion to reprise the well-settled standards governing our review of PSC orders. *See Office of the People's Counsel v. Pub. Serv. Comm'n,* 799 A.2d 376, 380 (D.C.2002). By statute, this court's review of a PSC order "shall be limited to questions of law, including constitutional questions; and the findings of fact by [PSC] shall be conclusive unless it shall appear that such findings … are unreasonable, arbitrary, or capricious." D.C.Code § 34–606. While "we … do not give the [PSC's legal] conclusion the same deference owed factual determinations, we nonetheless will sustain it if it is 'reasonable [and] based upon factors within the Commission's expertise.'" *Watergate East, Inc. v. Pub. Serv. Comm'n,* 662 A.2d 881, 886–87 (D.C.1995) (citation omitted). "[T]o ensure that judicial review can be meaningful," this court requires that the PSC "explain its actions fully and clearly." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 661 A.2d 131, 135 (D.C.1995). If it has done so, "the petitioner challenging [a PSC] order assumes 'the heavy burden of demonstrating clearly and convincingly a fatal flaw in the action taken.'" *Watergate East, supra,* 662 A.2d at 886 (citation omitted). Indeed, we have repeatedly characterized our review of PSC orders as "the narrowest judicial

**6.** PSC and the intervenors suggest that the appeal by DCG is not properly before us under D.C.Code § 34–604(b) since it did not formally join WASA in the petition for reconsideration. The District before us makes no arguments distinct from WASA, which is, as noted above, an entity within the District government taken as a whole, and the District was directly involved in all substantive aspects of the proceedings leading to the appeals before us. The statute itself does not expressly require that the entity taking the appeal be the precise entity that filed the application for reconsideration, although it does limit the range of arguments that may be made to us. See note 15, *infra.* We are satisfied that at least in the circumstances here, we may properly treat DCG as a party in the appeal before us.

review in the field of administrative law." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n*, 402 A.2d 14, 17 (D.C.) (en banc), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979); *Potomac Elec. Power Co., supra*, 661 A.2d at 135. Utilizing these principles of appellate review applicable here, we turn to the challenged orders.

### A.

■ We first address petitioners' claim that PSC failed to address all the issues relevant to approval of the Settlement. Towards the beginning of Phase II, various parties submitted lists of issues they wished explored during the unbundling proceeding. *See* Order No. 11673 at 2–9. PSC then whittled the various submissions down to one list of 17 issues that it said needed to "be addressed to unbundle rates." Order No. 11673 at 11. However, once the settling parties notified PSC that they had a proposed settlement, PSC issued a new order directing interested parties to file testimony on whether the proposed settlement was in the public interest. Order No. 11746 at 5; *see also* 15 DCMR § 130.11 (2002) ("A full settlement presented in a ... contested case ... shall only be accepted after a hearing on whether the settlement is in the public interest."). In response, WASA filed testimony that addressed many of the issues from Order No. 11673. PSC refused to accept the bulk of this evidence (a decision we address in more detail below) and also declined to address explicitly all the Order No. 11673 issues.

Petitioners contend that only by examining each issue from Order No. 11673 could PSC determine if the Settlement was in the public interest. However, according to PSC, the Order No. 11673 issue list pertained only to PEPCO's February 29, 2000 unbundled rate proposal, and when the Settlement superseded that proposal, the issue list was superseded as well. The only issues PSC would and did address during its consideration of the Settlement were those raised by the specific Settlement provisions as well as the public interest standard.

Each side attempts to bolster its position by citing the same case, *United States v. Public Serv. Comm'n*, 465 A.2d 829 (D.C.1983). That case dealt with PSC's approval of a non-unanimous settlement involving a Chesapeake & Potomac Telephone Company rate increase. At the beginning of the proceeding, PSC had designated thirteen issues that needed to be considered. *See* Order No. 7459 at 6–7 (Dec. 24, 1981). But after the settling parties submitted a proposed settlement, PSC convened a hearing whose only issue was whether approval of the settlement was in the public interest. *United States, supra*, 465 A.2d at 831. It did so over the General Services Administration's ("GSA") objections, which demanded a "trial-type hearing ... to explore disputed issues." *Id.* GSA petitioned this court, and we rejected their arguments, saying that PSC "is not bound to hold a hearing on every question" when considering a settlement offer. *Id.* at 832. Instead, PSC needed only to consider whether a settlement offer was in the public interest, and we concluded that it had done so. *Id.* at 833.

To be sure, differences do exist between this case and *United States*. Most notably, in *United States*, GSA in its application for reconsideration identified 21 issues that needed to be explored. However, for most of these, GSA did not proffer any testimony or cross-examination questions, so this court had no basis to determine what GSA hoped to establish regarding these issues. *Id.* at 833. In the present case, petitioners did proffer testimony that addressed what they considered to be nec-

essary issues, which indeed originated with the PSC itself in its Order No. 11673.

■ Nevertheless, the same overarching principle applies to both sets of facts. PSC "is not bound to hold a hearing on every question" when evaluating a proposed settlement. *Id.* at 832. In other words, PSC has a wide range of latitude in determining the range of issues it will explore when faced with a settlement offer as long as it still evaluates whether the settlement is in the public interest. An issue list published early in a PSC proceeding need not be a straitjacket that constrains PSC from adding or deleting issues as matters proceed and new evidence and arguments are developed in the record. In fact, while PSC did state at one point that all 17 issues needed to be addressed during Phase II, it also explained that it had "modified or clarified many of the [parties'] proposed issues in order to achieve the ultimate goal of this phase, *i.e.*, the establishment of unbundled rates necessary to implement retail choice." Order No. 11673 at 12–13. Once the settling parties presented PSC with a settlement offer, PSC had the prerogative to "modify or clarify" the issue list once again so that it could more efficiently achieve the "ultimate goal" of establishing unbundled rates that were in the public interest. "No principle of administrative law is more firmly established than that of agency control of its own calendar. . . . Consolidation, scope of the inquiry, and similar questions are housekeeping details addressed to the discretion of the agency and, due process or statutory considerations aside, are no concern of the courts. . . ." *Washington Urban League, Inc. v. Pub. Serv. Comm'n,* 295 A.2d 906,

908 (D.C.1972) (per curiam) (quoting *City of San Antonio v. C.A. B.,* 126 U.S.App. D.C. 112, 115, 374 F.2d 326, 329 (1967)); *see also Am. Iron & Steel Inst. v. OSHA,* 182 F.3d 1261, 1268 (11th Cir.1999) ("Logic dictates that an agency must have some discretion in setting an agenda for rulemaking and excluding some matters categorically."); *Cutler v. Hayes,* 260 U.S.App. D.C. 230, 247, 818 F.2d 879, 896 (1987) ("An agency has broad discretion to set its agenda and to first apply its limited resources to the regulatory tasks it deems most pressing."). Consequently, we find petitioners' first claim to be without merit.

**B.**

Petitioners' second claim is intertwined with their first. They argue that PSC acted arbitrarily and capriciously when it refused to admit large portions of DCG/WASA's proposed joint testimony, to be presented through their single witness Petniunas, on a variety of subjects related to the Settlement proposal. However, PSC did not exclude everything offered by DCG/WASA witness Petniunas. His testimony on revenue neutrality and seasonal use did become part of the record.

In its original oral ruling, PSC said that the excluded testimony raised issues either previously decided or else not properly before PSC during consideration of the Settlement. In its order denying DCG and WASA's application for reconsideration, PSC reiterated these same reasons and added that the stricken testimony was irrelevant to the question of whether the Settlement was in the public interest. Order No. 11851 at 3.[7]

---

7. PSC also rejected a large portion of Petniunas' testimony in part because it had "failed to comply with Order No. 11746 by failing to include a point-by-point response to each aspect of the settlement." Order No. 11851 at

2. Petitioners argue that such a requirement should not have led to the exclusion of the testimony. While we might agree that a ruling based only on a technical violation would be harder to sustain, PSC also rejected the

In our review of PSC's decision to strike, we are mindful that any administrative agency such as PSC may "exclude irrelevant, immaterial, and unduly repetitious evidence." D.C.Code § 2–509(b). Agencies may exercise their discretion in determining the admissibility of evidence. With respect to trial judges, we have said that "[a]n evidentiary ruling by the trial judge on the relevancy of a particular item is a 'highly discretionary decision' that will be upset on appeal only upon a showing of 'grave abuse.'" *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990) (citations omitted). Given the flexibility of their proceedings and their expertise, administrative agencies are "invested with a correspondingly greater discretion than trial judges in determining the admissibility of evidence." *Haight v. District of Columbia Alcoholic Beverage Control Bd.*, 439 A.2d 487, 491 (D.C.1981). On the record before us, we perceive no grave abuse of discretion in PSC's determination that the stricken testimony had no bearing on the fundamental issue at stake in Phase II: how to unbundle PEPCO's rates for retail services. For example, much of the excluded testimony (including cost-allocation methodologies and WASA's paying for facilities it did not utilize) involved rate review of the unbundled rates, an issue petitioners claim PSC erroneously failed to consider during Phase II. But PEPCO's rates had already been set during a previous rate case and these rates had then been reduced and capped as part of the Phase I Settlement. Order No. 11926 at 10. PSC could legitimately conclude that it was unnecessary to investigate these rates during an unbundling proceeding that "involve[d] the disaggregation of the previously approved rates into their various components, *e.g.*, production, transmission and distribution." *Id.* Thus, PSC was justified in excluding testimony related to rate review.[8]

Similarly, WASA offered testimony and extensive arguments on system reliability. While WASA claimed that the Settlement needed to address the provision of ancillary services,[9] PSC concluded that the only reliability issue implicated by the Settlement involved the deregulation of the EUM Program.[10] It therefore struck petitioners' testimony on ancillary services, and we must defer to PSC's judgment as

---

testimony for the more substantive reasons outlined above.

8. WASA also contends that PSC promised to investigate PEPCO's rates during the unbundling proceeding because PSC said that it would "ensure that the rates are unbundled in a just and reasonable manner .... Whether the rates are established through negotiation or through a Commission proceeding, we will ensure that the rates for all customers, including residential customers, are reasonable within the context of the future market structure." Order No. 11576 at 63. PSC also promised to "evaluate PEPCO'S rates during its unbundling proceeding, to the extent necessary to ensure that the rates are unbundled in a just and reasonable manner." Order No. 11628 at 15.

We do not agree with WASA that these statements constituted a promise to investi-gate PEPCO's rates as a part of the Phase II process now before us. All they say is that PSC will ensure the reasonableness of the unbundled rates, and we must defer to PSC's determination that no investigation was required to ensure reasonable rates when such rates had already been set during Phase I and when PSC explicitly acknowledged its authority to review rate levels at the end of the rate cap period and make adjustments if necessary. Order No. 11845 at 19.

9. Ancillary services are services provided by electricity generation plants to support the reliable transmission of sufficient amounts of electricity.

10. "EUM Programs are voluntary programs operated by PEPCO to reduce the loads of participating customers during peak times on the system." Order No. 11845 at 11 n. 48.

to what needed to be examined as part of the Phase II process then before it on the issue of system reliability.[11]

■ WASA also wished to offer testimony on the applicability of a FERC seven-factor test to PEPCO's classification of its facilities as distribution or transmission.[12] However, all of WASA's evidence involved the mere possibility that FERC might review PEPCO's facility classifications and that this review could produce results inimical to the interests of District of Columbia consumers. We can find no error in excluding evidence on a topic that was speculative at best.

In light of our discussion in II.A, we also must conclude that PSC's decision to strike that portion of Petniunas' testimony that discussed all 17 issues from Order No. 11673 was not unreasonable. Finally, PSC permissibly excluded evidence that related to retail electric competition in general but not to the unbundling of PEPCO's rates specifically, e.g., testimony on market power, California's experience with deregulation and the availability of retail bilateral contracts[13] to District of Columbia electricity customers. In sum, PSC did not act arbitrarily or capriciously when it struck the vast majority of DCG/WASA's testimony.

## C.

We turn now from subjects PSC did not consider during Phase II to those that were part of the proceeding. Of the issues that PSC did take up, petitioners challenge most vigorously PSC's decision on revenue neutrality.[14] Under the Settlement, rates will be unbundled in a revenue neutral manner, i.e., the percentage of total revenues from each customer rate class will not change. WASA objects to a revenue neutral unbundling and claims that PSC incorrectly concluded that the rate cap established in Phase I mandated that the rates be unbundled in a revenue neutral manner. See Order No. 11845 at 19. WASA offers a lengthy and complicated argument as to why the Phase I Settlement permits rates in which revenue responsibility may shift between customer classes. However, PSC permissibly interpreted the Phase I Settlement to the contrary, and had before it evidence from OPC witness Karl Pavlovic that unbundling the rates in a non-revenue neutral manner would result in certain customers not enjoying the full measure of rate decreases mandated by the Phase I Settle-

11. We note that PSC was not satisfied with the Settlement's treatment of the critical issue of system reliability and capacity. Order No. 11815 at 14. As a result, it ordered the Signatory Parties to discuss the issue of system reliability during a future discussion mandated by the Settlement. PSC also ordered PEPCO to submit a compliance filing demonstrating that deregulation of the EUM Program would not reduce system reliability and invited other parties to comment on PEPCO's filing. Id.

12. FERC's seven-point test distinguishes between interstate transmission and local distribution of electricity for jurisdictional purposes. If utilities engage in unbundled retail transmission in interstate commerce, FERC will have exclusive jurisdiction. See Promoting Wholesale Competition Through Open Access Non–Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities, FERC Order No. 888, 61 Fed.Reg. 21,540, 21,619–20 (1996).

13. Retail bilateral contracts would allow an electricity customer to contract for the output of local generating resources and have them delivered over PEPCO's distribution lines without the customer paying for any of the costs of the interconnected transmission grid.

14. When we asked WASA's counsel at oral arguments which of the many issues on review he wished to focus on, he replied that revenue neutrality was the key one.

ment. Thus, PSC's decision was based on substantial evidence and was not unreasonable.

Petitioners make much of the fact that among the 17 issues from Order No. 11673 was the following. "Should the unbundling of existing rates be class neutral and customer bill neutral as PEPCO proposes? If the answer is no, what is a preferable practical alternative in view of the rate reduction, rate cap and restructuring timeline specified in Order No. 11576?" Petitioners claim that by raising this as an issue, PSC was in effect saying that Phase I did not prohibit the unbundling of rates in a non-revenue neutral manner. We note, however, that the second question appears to indicate an acknowledgment by PSC that the Phase I Settlement could curtail any attempts to avoid revenue neutrality. Moreover, as already discussed at some length in part II.A, *supra*, PSC had wide latitude to modify or drop this issue, as well as any other issue from Order No. 11673, as matters progressed and new evidence and arguments were developed. Indeed, after the issue list was promulgated, OPC introduced into evidence the abovementioned testimony of Pavlovic, which PSC explicitly relied upon in reaching its decision on revenue neutrality.

### D.

Petitioners advance several other claims, which we deal with briefly. First, petitioners claim that PSC's decision to approve the settlement was not based on substantial evidence in the record. Under PSC's own procedures, a "Commission decision to adopt a nonunanimous settlement as a resolution on the merits shall be based upon substantial evidence upon the record." 15 DCMR § 130.13. Both OPC and PEPCO offered extensive testimony and exhibits that PSC relied upon in approving the Settlement. In its Order approving the Settlement, PSC first summarized the evidence in the record pertaining to each section of the Settlement and then explained, with ample citations to the evidence, why each section was in the public interest. The fact that petitioners offered countervailing evidence as to why the Settlement was not in the public interest does not change the conclusion that PSC's approval of the Settlement was based on substantial evidence in the record. *See United Unions, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 554 A.2d 313, 315–16 (D.C.1989) ("an agency, as a finder of fact, may credit the evidence upon which it relies to the detriment of conflicting evidence").

Next, petitioners allege that PSC's handling of the Settlement violated District of Columbia administrative law. Petitioners claim that PSC did not treat consideration of the Settlement as a contested case, which would implicate the requirements of D.C.Code § 2–509(b), i.e., "[e]very party shall have the right to present in person or by counsel his case ... by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." We may assume that this section does apply to the Phase II proceeding and have even previously noted its applicability in the context of a nonunanimous utility settlement. *See United States, supra,* 465 A.2d at 833. But we do not discern any violation of § 2–509(b) when DCG and WASA both offered testimony to PSC and conducted cross-examination of other parties' witnesses. Petitioners also claim a violation of D.C.Code § 2–509(e), which requires that orders contain findings of fact and conclusions of law supported by substantial evidence. Both Orders No. 11845

and 11926 fulfilled this requirement.[15]

The process of establishing the deregulation of the electricity market is plainly a difficult effort. The PSC has primary responsibility for supervising this process and must be afforded wide discretion in determining both the substance and the timing of the manifold considerations that bear upon the process. Mindful of the scope of our review, we can see no basis to upset the orders now before us.

*Affirmed.*

15. Finally, WASA argues that PSC rushed in approving the Settlement to meet a January 1, 2001 deadline for implementation of a residential retail access pilot program and that this haste led to arbitrary and capricious decision making. However, WASA did not raise this argument in its application for reconsideration of Order No. 11845. District of Columbia law states that "[n]o public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application [for reconsideration]." D.C.Code § 34–604(b). Therefore, WASA is barred from raising this argument on appeal when it was not part of its application for reconsideration. *See District of Columbia Tel. Answering Serv. Comm. v. Pub. Serv. Comm'n,* 476 A.2d 1113, 1121 (D.C.1984).