**OFFICE OF the PEOPLE'S COUNSEL, Petitioner,**

v.

**PUBLIC SERVICE COMMISSION of the District of Columbia, Respondent,**

and

**Potomac Electric Power Company, Intervenor.**

Nos. 10–AA–1223, 10–AA–1504.

District of Columbia Court of Appeals.

Argued April 26, 2011.

Decided June 23, 2011.

Randolph Lee Elliott, with whom Bethany Pribila, Kevin J. Conoscenti, Washington, DC, Brenda K. Pennington, Sandra Mattavous–Frye, Karen R. Sistrunk, and

Brian O. Edmonds, Washington, DC, were on the brief, for petitioner.

Richard S. Herskovitz, with whom Richard A. Beverly and Christopher Lipscombe were on the brief, for respondent.

Nicholas S. Penn, Kavita T. Aildasani, Kirk J. Emge, and Deborah M. Royster, Washington, DC, filed a brief for intervenor.

Before RUIZ and THOMPSON, Associate Judges, and NEBEKER, Senior Judge.

THOMPSON, Associate Judge:

In the matters before us, the District of Columbia Office of the People's Counsel ("OPC") seeks review of a series of orders of the Public Service Commission of the District of Columbia (the "Commission") that rejected OPC's requests that Potomac Electric Power Company ("Pepco") be compelled to provide OPC with copies of certain diagrams and maps depicting Pepco electrical substations, transformers and feeders (documents that OPC seeks in connection with its efforts to analyze the causes of electrical outages and electrical service reliability problems experienced by District of Columbia consumers). We remand these matters to the Commission for findings about whether (and, if so, for an explanation of why) the office-inspection restriction that the Commission ordered is

"necessary" to protect against public disclosure of the documents that OPC seeks to obtain. D.C.Code § 34–1118(c) (2001).

**I.**

On June 17, 2008, the Commission initiated Formal Case No. 1062, an investigation into the causes of an electrical power outage that affected a large section of the District of Columbia on June 13, 2008, and that originated at Pepco Substation # 52, located on 10th Street, N.W. To carry out its role in that investigation,[1] OPC made a number of document and information requests to Pepco, including, *inter alia,* a request for true-to-size copies of the "one-line diagram of [Pepco's] Tenth Street substation"[2] and the "diagram of the relay protection scheme for each of the supply transformers" at that substation. Pepco provided a narrative description of the "relay protection scheme for the four transformers," and allowed OPC representatives to inspect the relevant diagrams (after OPC executed a confidentiality agreement prepared by Pepco (the "Confidentiality Agreement")), but Pepco declined to provide OPC with copies of the diagrams. Pepco asserted that the requested information was "confidential" and would be withheld for "legitimate national security reasons," but could be "viewed by appointment at Pepco's office."[3] Thereafter, OPC filed a series of

1. D.C.Code § 34–804(a) provides that OPC "shall be a party, as of right, in any investigation, valuation, revaluation, or proceeding of any nature by the Public Service Commission of or concerning any public utility operating in the District of Columbia."

2. A one-line diagram is "an abbreviated schematic representation of a power system in which three-phase transmission lines are shown as single lines between principal circuit components and from which circuit parameters are often omitted." PHILLIP A. LAPLANTE, COMPREHENSIVE DICTIONARY OF ELECTRICAL ENGINEERING 486 (2d ed.2005).

3. Pepco explained that the "diagrams OPC requests would provide specific details regarding the engineering and design of the distribution station as well as the arrangement and location of the electric supply equipment and lines in place and thus would constitute Critical Energy Infrastructure Information" [a term discussed *infra*] that is subject to "strict protection." It asserted that the diagrams would provide information regarding "potential vulnerabilities of the system which, in the wrong hands, could be invaluable in planning an attack on such critical infrastructure."

motions asking the Commission to compel Pepco to provide OPC with copies of the requested diagrams. In Order No. 15831, issued on June 7, 2010, the Commission directed that Pepco allow OPC personnel to review the requested documents "in detail, in person at [Pepco's] offices, and otherwise in accordance with the parties' confidentiality agreement, except that copying and/or removal of any of the documents from Pepco's offices is prohibited."[4] The Commission denied OPC's request for reconsideration of that ruling.[5]

In the meantime, in conjunction with Commission Formal Case Nos. 766, 982, and 991 (all of which pertain in part to the reliability of the Pepco electricity distribution system), OPC had requested from Pepco, *inter alia*, "copies of maps and diagrams" pertaining to "feeders in residential and commercial neighborhoods in the District" and "engineering studies performed on the feeders in Ward 4 and the Crestwood/Carter Barron community." Pepco eventually produced copies of the engineering studies, but withheld maps and diagrams that "depict the utility's critical infrastructure" information, stating that these could be viewed by appointment at Pepco's offices. OPC filed a motion asking the Commission to compel Pepco to produce copies of the withheld documents. In Order No. 15989, issued on September 23, 2010, the Commission denied OPC's motion to compel but—repeating the terms it imposed in Order 15831—"direct[ed] Pepco to allow OPC a reasonable opportunity to review the requested documents in

detail, in person at [Pepco's] offices, and otherwise in accordance with the parties' confidentiality agreement, except that copying and/or removal of any of the documents from Pepco's offices is prohibited." Again, the Commission denied OPC's request for reconsideration of its ruling.

There followed the instant petitions by OPC for review of the Commission's orders (including its orders denying reconsideration: Order No. 15915, issued on August 6, 2010, and Order No. 16066, issued on November 22, 2010).

## II.

■■■ Before turning to the merits, we address briefly the issue of our jurisdiction to review the Commission orders now, when the formal proceedings to which they relate (Formal Cases 766, 982, 991, and 1062) have not yet concluded. We raised this issue *sua sponte* at oral argument, pointing out that the Commission's rulings on OPC's motions to compel are analogous to discovery rulings, which our case law typically treats as interlocutory and not immediately reviewable. *See, e.g., Crane v. Crane,* 657 A.2d 312, 315 (D.C.1995) (explaining that "[d]iscovery orders typically bespeak their own interlocutory character," and thus ordinarily are not final for purposes of appeal) (citation and internal quotation marks omitted); *cf. Office of the People's Counsel v. Pub. Serv. Comm'n,* 414 A.2d 516, 517 (D.C.1980) (dismissing petition for review of Commission order on ground that evidentiary rulings "are inter-

---

4. The Commission stated that it was "unable to determine with any degree of certainty whether disclosure of the requested maps and diagrams do in fact pose a threat to national security," but concluded that "the mere assertion of the national security/critical infrastructure claim is sufficient to direct some protection against indiscriminate disclosure." It expressed the view that "the threat posed by supplying such maps and diagrams is so

obvious that we accept Pepco's general assertion that it could compromise infrastructure security."

5. The record indicates that Pepco complied with the Commission's directive and that, in the course of the mandated inspection opportunity, "Pepco personnel answered, in great detail, all of OPC's questions regarding the documents."

locutory and nonappealable"). For several reasons, we have concluded that we do have jurisdiction to review the challenged rulings.

■ First, our case law recognizes that "[i]t is not necessary that an order be issued at the conclusion of a proceeding; a 'final' order may be issued and reviewed at any point during a Commission proceeding." *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 455 A.2d 374, 378 (D.C. 1982); *see also Goodman v. Pub. Serv. Comm'n,* 467 F.2d 375, 377 (D.C.Cir.1972) ("For purposes of judicial review[,] the finality of an agency order depends upon the nature of the order rather than its chronology in relation to the whole of the agency proceedings."). Second, an order may be final and subject to immediate review if it "den[ies] a right," *Potomac Elec. Power Co.,* 455 A.2d at 377, and the Commission rulings involved here restrict OPC's "right to obtain" documents reasonably relevant to the Commission investigation. D.C.Code § 34–1118(c). Thus, "the impact of (the Commission's order) is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Chesapeake & Potomac Tel. Co. v. Pub. Serv. Comm'n,* 378 A.2d 1085, 1087 n. 8 (D.C.1977) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Third, a "relevant consideration[ ] in determining finality [is] whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication." *Goodman,* 467 F.2d at 377. Here, neither the parties nor the intervenor has suggested that our review of OPC's petitions will disrupt the ongoing proceedings before the Commission.

■ Fourth, "[a]nother factor that warrants consideration is whether postponing review will cause irreparable harm to the interests of the party seeking review." *Potomac Elec. Power Co.,* 455 A.2d at 378. Here, OPC contends that understanding the design and relay protection scheme for the transformers must be "done through visualization," i.e., through study of "drawings that show the requested information"; and that without the requested diagrams, "it is impossible to tell where and what actions can be taken to improve this vital part of Pepco's distribution system." It further asserts that the "Commission's added restriction against making copies, partial copies or other representations of the operating documents" and the resultant lack of continuous access to the documents "render[ ] OPC's access ineffective and virtually valueless," impede its "ability to perform a thorough analysis" of the issues while the Commission investigation is underway,[6] and "greatly defeat[ ] OPC's ability to meaningfully participate in the formal case," all to the "severe detriment" of the public whose interests OPC is charged with representing. *See* D.C.Code 34–804(d). In addition, it is unclear when the underlying formal Commission proceedings will conclude,[7] and whether, when

---

6. We note in this regard that the Council of the District of Columbia has recognized that "[i]n order for OPC's advocacy to be effective, it must be able to conduct *timely* analyses of the engineering ... aspects of utility company operation." D.C. Council Committee on Public Services and Cable Television, Report on Bill 5–225 at 7 (June 20, 1984) (emphasis added). Pepco acknowledges that the diagrams OPC is seeking "would provide specific details regarding the *engineering* ... of the distribution station ...." (emphasis added)

7. We have commented before on the Commission's unusual case numbering system, *see Office of the People's Counsel v. Pub. Serv. Comm'n,* 955 A.2d 169, 174 (D.C.2008). Here, the record in No. 10–AA–1504 bears a cover sheet explaining that Commission Formal Case Nos. 766, 982 and 991 "were initiated more than 10 years ago by the Commission concerning matters related to electricity issues and the Pepco" and that "[s]ince then a variety of matters that are related to electric issues, but not necessarily to each other or to

the Commission concludes its investigation, it will issue an order as to which OPC could seek review by this court. *Cf. Crane,* 657 A.2d at 316 (explaining that a trial court's order denying discovery is a final appealable order if dismissal of an appeal "would effectively deny the aggrieved party appellate review at any time"). It appears to us that the issues presented may be "too important to be denied review and too independent of the cause to require that appellate consideration be deferred until the whole case is adjudicated." *Potomac Elec. Power Co.,* 455 A.2d at 378 (quoting *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). For all of these reasons, we conclude that the petitions are ripe for review.

### III.

We next briefly identify several issues that we are *not* called upon to address in resolving the petitions before us, notwithstanding the considerable attention that the parties' and intervenor's briefs devote to these issues.

The first issue that we need not resolve relates to the scope of the Commission's authority under D.C.Code § 34–1118(c). That section establishes that OPC is entitled to obtain from a public utility being

investigated "all information and documents reasonably relevant and material to the investigation or proceeding"; that if the public utility fails to produce these materials, OPC may petition the Commission to issue an order compelling their production; and that the Commission may, "[w]hen necessary to protect the disclosure of trade secrets and other confidential research, development, or commercial information," issue a protective order placing conditions on the release of the materials. *Id.* In its filings before the Commission and in its initial brief to this court, OPC questioned whether the language of section 34–1118(c) permits a public utility to withhold relevant information on the ground that the information implicates security considerations rather than the protection of trade secrets or other proprietary information. In its reply brief, however, OPC accepts that the Commission has authority under section 34–1118(c) to protect information that "is in fact highly sensitive or critical to national security or a utility's critical infrastructure." [8] Accordingly, our analysis assumes rather than decides that the Commission acted within its authority in issuing orders designed to protect such information.

the subject matter of OPC's Petition for Review, have been docketed at those Formal Case numbers." In short, if review had to await conclusion of the underlying formal cases, it seems that the wait could be indefinite.

8. For its part, the Commission cites, as sources of its authority to protect such information, section 34–1118(c) as well as two other D.C.Code sections: D.C.Code § 34–403 (providing that the Commission "shall have, in addition to the powers in this subtitle specified, mentioned, and indicated all additional, implied, and incidental power which may be proper and necessary to effect and carry out, perform, and execute all the said powers herein specified, mentioned, and indicated"),

and D.C.Code § 34–301(2) (charging the Commission with responsibility to, *inter alia,* "promote the public interest, [and] preserve the public health" in connection with the transmission and distribution of electricity and to protect those employed in the "operation of the works, wires, poles, lines, conduits, ducts, and systems" involved in electricity transmission and distribution). The Commission also "view[s] the phrase in [s]ection 34–1118(c), 'to protect the disclosure of trade secrets and other confidential research, development, or commercial information,' as illustrative of the types of information that can harm [a] utility," rather than as exhaustive of the types of information that may be a proper subject of a Commission protective order.

Second, we need not resolve whether the maps and diagrams in issue are entitled to be protected as "confidential." In its briefs submitted to the Commission and to this court, OPC argued that "[s]ection 34–1118(c) does not authorize the Commission to protect the disclosure of information that a party merely *asserts*, without factual substantiation, ... *may be*, confidential" (emphasis in original). At oral argument, however, counsel for OPC acknowledged that the Pepco documents in issue "probably should be non-public" and confirmed that OPC's concern is with the breadth of the restrictions that the Commission ordered. Thus, at least for present purposes, OPC does not take issue with Pepco's designation of the documents as "confidential" or with the Commission's acceptance of that designation.[9] (And indeed, from the outset of the dispute, OPC has been willing to handle the documents as required under its Confidentiality Agreement with Pepco.)

A related issue that was disputed before the Commission but that we need not resolve is whether the maps and diagrams in question constitute, or are the equivalent of, "critical energy infrastructure information" ("CEII") as that term is defined in Federal Energy Regulatory Commission ("FERC") regulations. *See* 18 C.F.R. § 388.113(c).[10] FERC regulations subject such information to limitations on use and disclosure to "ensure that information deemed CEII stays out of the possession of terrorists." 18 C.F.R. § 388.113(d)(4). In initially ruling on OPC's motion to compel, the Commission required OPC to obtain a FERC determination as to whether the requested diagrams could be released to OPC pursuant to that agency's CEII disclosure rules. After a series of correspondence with FERC, OPC learned that the diagrams it had requested, of substations in specific locations in the District of Columbia used for local distribution of electricity, are not filed with FERC,[11] and thus cannot be processed or obtained under FERC's CEII disclosure rules. Because OPC agrees that the documents may be treated as confidential, we need not decide whether, as Pepco has asserted, the requested diagrams and maps involve the same security concerns as FERC-regulated CEII, or whether their unrestricted disclosure would pose a "national security" risk or a risk to Pepco's critical infrastructure. We do note, however, that FERC has recognized that diagrams and maps of "electrical transmission and distribution network[s] ..., including local distribution networks and feeders," "could be used to harm the electric grid, which would endanger life and safety" and "could be harmful

---

**9.** Accordingly, we need not address the issue, discussed in the Commission's brief, of whether OPC's petitions for review are premature, since OPC failed to request that the Commission make a ruling on confidentiality pursuant to the Commission's Proprietary Information Determination Request ("PIDR") regulations. *See* 15 DCMR § 150.5(a).

**10.** FERC regulations define "critical infrastructure" to mean "existing and proposed systems and assets, whether physical or virtual, the incapacity or destruction of which would negatively affect security, economic security, public health or safety, or any combination of those matters." 18 C.F.R. § 388.113(c)(2) (2010). "Critical energy in-

frastructure information" means "specific engineering, vulnerability, or detailed design information about proposed or existing critical infrastructure that: (i) Relates details about the production, generation, transportation, transmission, or distribution of energy; (ii) Could be useful to a person in planning an attack on critical infrastructure; (iii) Is exempt from mandatory disclosure under the [federal] Freedom of Information Act, 5 U.S.C. 552; and (iv) Does not simply give the general location of the critical infrastructure." 18 C.F.R. § 388.113(c)(1).

**11.** FERC's jurisdiction is over the "transmission of electricity in interstate commerce." 16 U.S.C. § 824(b)(1) (2000).

in the wrong hands." [12] (Moreover, as we discuss below, the evidence in the record that FERC was willing to release CEII information to OPC as a requester with a legitimate need for such information adds weight to OPC's argument that any order that the Commission fashions to protect Pepco infrastructure should recognize OPC's status as a government agency with a legitimate need for the requested maps and diagrams.[13])

Finally, because OPC accepts the "confidential" designation of the documents in issue, we need not address OPC's argument that, in accepting without evidentiary substantiation Pepco's claim to confidentiality of the documents on the basis of national security considerations, the Commission effectively "established a new practice or policy relating to the disclosure of materials between parties" without compliance with the rulemaking procedures required by law.

### IV.

 Finally, we turn to the merits. "Under the general limited review that we undertake of any agency decision, 'we must affirm [the Commission's rulings] unless we conclude that [they were] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Office of the People's Counsel v. Pub. Serv. Comm'n,* 955 A.2d 169, 173

(D.C.2008) (citing *King v. District of Columbia Water & Sewer Auth.,* 803 A.2d 966, 968 (D.C.2002)). OPC contends that the Commission's rulings fail on all of the foregoing grounds. Although we express no opinion about the appropriateness of the particular restrictions the Commission imposed, we are constrained to agree with OPC that the Commission acted arbitrarily and contrary to law in the approach it took and the rationale it applied to arrive at its rulings.

 As discussed above, the governing law is D.C.Code § 34–1118(c). Section 34–1118(c) does two things that are important to our analysis: First, it confers on OPC a "right to obtain," from a public utility, information and documents that are reasonably relevant and material to a Commission investigation or proceeding. Thus, section 34–1118(c) establishes a presumption in favor of disclosure of materials that are relevant and material to a Commission investigation (and, notably, in this case, neither the Commission nor Pepco has suggested that the documents that OPC seeks are either irrelevant or immaterial [14]). This means that the burden of justifying any restriction on disclosure of relevant and material information to OPC must in the first instance fall on the public utility, i.e., Pepco.[15] Second, section 34–1118(c) authorizes the Commission to issue a protective order placing conditions on

**12.** *Eli Richards,* No. CE07–160–000, 2007 WL 2028440, at *1–*2, 2007 FERC LEXIS 1308, at *1–*5 (July 13, 2007).

**13.** FERC "verified that [OPC is] an independent agency of the District of Columbia government that advocates for consumers of natural gas, electric and telephone services," and on that basis made a "discretionary [full] release" to OPC of certain CEII documents that FERC mistakenly thought OPC had requested (one-line transmission diagrams rather than one-line distribution diagrams) under the terms of a non-disclosure agreement executed by OPC. FERC has stated that it is "unwilling to restrict access to [CEII] necessary to conduct valuable research or to provide legiti-

mate services," and has determined that release of such information is appropriate in accordance with the terms of FERC CEII non-disclosure agreements. *Eli Richards,* 2007 WL 2028440, at *1–*2, 2007 FERC LEXIS 1308, at *5.

**14.** Indeed, in its ruling in Formal Case No. 1062, the Commission stated that it has "no doubt that the documents requested are relevant and material to the subject matter" of the Commission investigation.

**15.** Notably, in approving the legislation that became section 34–1118(c), the Committee on Public Services and Cable Television of the Council of the District of Columbia character-

the release of the materials to OPC "[w]hen necessary" to protect the materials against further disclosure. We read the phrase "[w]hen necessary" to mean that the Commission is not authorized to issue a protective order further restricting the release of documents to OPC on the mere ground that documents are confidential, when OPC has agreed to treat them confidentially. In addition, we conclude, because section 34–1118(c) contains a "[w]hen necessary" qualifier, the Commission was incorrect in asserting in its rulings under review that section 34–1118(c) grants it "broad authority" to fashion a protective order if it simply *"believes there is good reason to do so "* (emphasis added). Although we accord great weight to the Commission's interpretation of the statute it is charged with administering, "the judiciary is the final authority on issues of statutory construction," *Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.,* 952 A.2d 168, 173 (D.C.2008), and we will not defer to the Commission's interpretation of section 34–1118(c) if (as we find) it is inconsistent with the "unambiguously expressed intent of [the legislature]." *Chevron U.S.A., Inc. v. Natural*

*Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Contrary to the Commission's interpretation, section 34–1118(c), by its plain language, tethers the Commission's authority to issue a protective order restricting OPC from "obtain[ing]" relevant and material public utility documents to a finding that a protective order is "necessary." [16]

The Commission issued its rulings after Pepco asserted that "[p]ublic disclosure of [the requested] information would be invaluable for any plans seeking to cause damage to ... critical infrastructure." However, this assertion, which addressed only the harm that might ensue from *public* disclosure, supported at most that the documents and maps are entitled to be treated as confidential and kept out of the hands of the public at large; it said nothing to justify restrictions on OPC. Pepco's lawyers also made similarly unsupported assertions that an order compelling the release of copies of the maps and diagrams would "severely inhibit[ ] the Company's ability to properly protect such data" and would "greatly increase[ ] the likelihood that this information may be obtained by

---

ized it as "similar to Rule 26(c) of the Civil Rules of the D.C. Superior Court." D.C. Council Committee on Public Services and Cable Television, Report on Bill 5–225 at 9 (June 20, 1984). Under Rule 26(c), "the burden is upon the party seeking non-disclosure or a protective order" to show why it should be granted. *Penthouse Int'l v. Playboy Enters., Inc.,* 663 F.2d 371, 391 (2d Cir.1981); *see also Plough, Inc. v. Nat'l Acad. of Sciences,* 530 A.2d 1152, 1156 n. 5 (D.C.1987) (providing that in interpreting Superior Court Rule 26(c), we are guided by decisions construing its counterpart in the Federal Rules of Civil Procedure).

**16.** *Cf. North Carolina v. E.P.A.,* 531 F.3d 896, 922 (D.C.Cir.2008) (reasoning that provision of the Clean Air Act that authorized EPA "to prescribe such regulations as are *necessary* to carry out [its] functions under" the Act did not authorize EPA to limit or terminate elec-

tric generating units' sulfur dioxide emissions allowances under Title IV of the Act, since EPA could not claim that retiring such allowances was "necessary" to ensure maintenance of ambient air quality standards, and explaining that "[a]lthough it may be *reasonable* for EPA, in structuring [its interstate clean air] program ... to consider the impact on the Title IV [allowances] market, it does not follow that EPA has the authority to remove allowances from that market") (emphasis added); *Industrial Union Dep't, AFL–CIO v. Am. Petroleum Inst.,* 448 U.S. 607, 659, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (noting that the governing statute did not give OSHA "unbridled discretion" to adopt standards relating to workplace safety, and affirming ruling that OSHA exceeded its statutory authority where it set a new benzene exposure limit without having determined, as the statute required, that the limit was reasonably necessary to provide safety in the workplace).

the public." The Commission made no independent inquiry as to whether the goal of protecting the maps and diagrams against public disclosure could be achieved without barring OPC from obtaining the requested copies.[17] Thus, the Commission made no finding—and it had no ostensible basis for a finding—that a restriction on OPC's obtaining copies of the maps and diagrams was "necessary" to protect the documents.

Further, the record makes it at least questionable whether the Commission could reasonably have made such a finding of necessity. According to papers that OPC filed with the Commission, when OPC representatives first inspected the documents in dispute here and requested true-to-size copies, "Pepco representatives seemed amenable to OPC's request" (al-though "OPC was informed that someone higher up in the chain of command would have to decide if the information was going to be released"), and employees at Pepco initially "were told to start the [copying] process." If this account is correct, it suggests that the necessity to protect the documents from any copying for non-Pepco staff was not well known within Pepco, even though, as OPC asserted to the Commission, it would seem that this "should be top priority and known to all Pepco employees, especially the attorneys in General Counsel." In addition, as far as we can tell from the record, Pepco has neither provided information to the Commission about what measures it has in place to protect and secure the maps and diagrams within its company from "a rogue employee [who might] want[ ] to cause harm,"[18]

17. For example, the Commission did not inquire of Pepco, and Pepco did not explain, why a non-disclosure agreement such as FERC requires before releasing CEII (which goes beyond the conditions set out in the Confidentiality Agreement) would not provide the desired protection. Under the Confidentiality Agreement, when Pepco discloses confidential documents to OPC, it limits review of the documents to "the signatory party and its agents, employees, authorized representatives, including counsel of record, associate attorneys, paralegals, economists, statisticians, accountants, consultants, or any other persons employed or retained by the signatory party to assist in this proceeding." FERC's general non-disclosure agreement goes further and requires that the documents be disclosed only to individuals who have executed a non-disclosure agreement, and that recipients of CEII return or destroy the CEII within fifteen days of a request to do so and, upon request, submit an affidavit attesting to the destruction. The record contains no analysis of whether such terms, or alternative controls other than office-inspection restrictions, might suffice to protect the Pepco maps and diagrams. Cf., e.g., 6 C.F.R. § 27.400 (2007) (Department of Homeland Security regulation restricting access to "Chemical-terrorism Vulnerability Information (CVI)" to individuals who have a "need to know," and providing

that the Department "may make an individual's access to the CVI contingent upon satisfactory completion of a security background check"); 49 C.F.R. § 1520.15(d)(2) (2010) (Department of Transportation regulation establishing that prior to providing sensitive security information to a person in the context of an administrative enforcement proceeding, "TSA or the Coast Guard may require the individual or, in the case of an entity, the individuals representing the entity, and their counsel, to undergo and satisfy, in the judgment of TSA or the Coast Guard, a security background check").

18. 68 Fed.Reg. 9857, 9866 (March 3, 2003) (discussion in FERC notice of proposed rulemaking pertaining to whether owners or operators of energy facilities would be required to execute non-disclosure agreements to obtain CEII about their own projects that might fall into the hands of employees who might want to cause mischief); cf. Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Securities Dealers, Inc., 2008 WL 199537, at *7, 2008 U.S. Dist. LEXIS 4617, at *18–*19 (S.D.N.Y. Jan. 23, 2008) (reasoning that NASD had "shown good cause for the imposition of a blanket protective order" since it "demonstrated that it keeps such information strictly confidential, even within the organization itself").

nor identified any reason to suspect that OPC staff or consultants would not abide by the terms of a confidentiality or non-disclosure agreement. We also note that documents in the record show that Pepco has utilized the services of engineering consultants to assess Pepco's underground infrastructure; Pepco did not advise the Commission about what, if any, restrictions Pepco imposes on these individuals' and firms' access to copies of diagrams and maps depicting the infrastructure. Without having considered such (and, perhaps, other) information, the Commission had no basis for finding that an order limiting OPC inspection of the maps and diagrams in Pepco's offices was necessary.

Rather than make a determination of whether it was necessary to restrict OPC's access to the maps and diagrams as section 34–1118(c) commands, the Commission focused on whether restricting OPC to inspection in Pepco's offices was unduly burdensome to OPC. It reasoned that "making numerous or repeated reviews of the documents at Pepco's offices are [*sic*] merely an inconvenience, not necessarily an impediment" to OPC.[19] In so reasoning, the Commission turned the statutory standard on its head. If the Commission had not found a protective order "necessary" to protect the utility's documents, entry of the protective order cannot be justified on the ground that the restrictions on access it imposes are not unduly burdensome to OPC, or on the ground that the restrictions do not entirely disable OPC from doing its work.[20] The Commission also appears to have lost sight of OPC's critical role as an independent investigatory authority and a statutory party in the regulatory scheme. *See* D.C.Code § 34–804(a). As noted earlier, the Council of the District of Columbia has recognized that "[i]n order for OPC's advocacy to be effective," OPC must be able to conduct "analyses of the engineering ... aspects of utility company operation." D.C. Council Committee on Public Services and Cable Television, Report on Bill 5–225 at 7 (June 20, 1984). All of the requested documents appear to relate precisely to that. The Commission's response to an OPC request for information should therefore facilitate, not hinder, OPC's ability to fulfill its statutory responsibilities, unless there is a clear basis for

**19.** The Commission also stated that "the possibility that [OPC] might have to review the documents several times at Pepco's offices does not outweigh the risk to national security that can result from disclosure of the documents," and that "[o]ther than the inconvenience of going to Pepco's offices, OPC never convinced the Commission that the Office's analysis in the investigation proceedings before the Commission has been in any way prejudiced or compromised by limiting the manner in which disclosure was limited here."

**20.** In essence, the Commission required OPC to demonstrate good cause why Pepco should be compelled to produce copies of the requested relevant and material documents. Yet, in adopting section 34–1118(c), the Council of the District of Columbia declined to incorporate suggested language that would have specified that if the public utility fails to produce such documents in a timely manner, "the Office may, by motion, petition the Commission, *on good cause shown*, to issue an order compelling its production" (emphasis added). *See* D.C. Council Office of the Legislative Counsel, "Recommended Clarifying Amendments by Legislative Counsel" to Bill 5–225 (Committee Print, June 20, 1984). We recognize that, historically, the Commission from time to time has restricted OPC to inspection at the offices of the public utility where OPC has "failed to show that the office inspection procedures ... are ... overly restrictive or burdensome." *See Formal Case No. 890, In the Matter of the Application of District of Columbia Natural Gas, a Division of Washington Gas Light Company,* Order No. 9437, at 3, 1990 WL 509758 (Feb. 12, 1990). However, the Commission's departure in past instances from the statutory standard does not justify its continuing to do so in the matters before us.

concluding that a restriction is "necessary."

## V.

For the foregoing reasons, we conclude that the Commission overstepped its authority under section 34–1118(c) in deciding not to enforce OPC's right to "obtain" the requested documents, without having made a determination that the restrictions it ordered were necessary. The Commission also erred by essentially reversing the burden implied by the statute—i.e., by requiring that OPC show that the restrictions are unduly burdensome, rather than requiring Pepco to prove that they are "necessary." In addition, the Commission erroneously exercised its discretion in fashioning the terms of the protective orders it issued.[21] For the Commission properly to exercise its discretion, it must make decisions "drawn from a firm factual foundation"—i.e., "the factual record must be capable of supporting the determination reached." *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979). It must "exercise its judgment in a rational and informed manner," meaning that it "should be apprised of all relevant factors pertaining to the pending decision," (and, in turn, a reviewing court "must determine whether the decision maker failed to con-

sider a relevant factor, whether [it] relied upon an improper factor, and whether the reasons given reasonably support the conclusion"). *Id.* at 365. It also should state the basis of its ruling "in sufficient detail so that both parties may, if they desire, object and seek to persuade [the Commission] to change the basis."[22] *Winkler v. Ballard*, 63 A.2d 660, 662 (D.C.1948). Here, the Commission did none of these things. Without the types of information discussed above—e.g., what internal measures Pepco takes to secure the maps and diagrams, how Pepco protects confidential infrastructure information disclosed to contractors, why a FERC-type non-disclosure agreement or other alternative controls would not suffice to protect copies of maps and diagrams produced to OPC—the Commission did not exercise its discretion in an informed manner. In addition, not having viewed or sought detailed descriptions of the documents that OPC has been limited to viewing onsite, the Commission did not have the information it needed to make an informed judgment regarding whether, as to each category of document,[23] the office-inspection limitation it imposed addressed OPC's asserted need for true-to-life sized copies; and to assess OPC's claim that it "need[s] to constantly refer to the information sought in order to adequately perform the analysis."

Accordingly, a remand is in order.[24]

---

**21.** Section 34–1118(c) authorizes the Commission to place conditions on the release of information "where appropriate," language that indicates that the Commission has some discretion with respect to the terms of protective orders. *See Illinois v. Interstate Commerce Comm'n*, 713 F.2d 305, 310 (7th Cir. 1983) ("The term 'appropriate' clearly denotes discretion[.]").

**22.** Explanation in sufficient detail also is required for meaningful judicial review and for there to be a basis for judicial deference to agency determinations. *District of Columbia v. Pub. Serv. Comm'n*, 802 A.2d 373, 376 (D.C. 2002).

**23.** *Cf. Diamond Ventures v. Barreto*, 452 F.3d 892, 898 (D.C.Cir.2006) (explaining that, when exercising its broad discretion under Fed.R.Civ.P. 26(c)(7) to issue a protective order for confidential documents, a trial court is required to undertake "an individualized balancing of the many interests that may be present in a particular case"). Here, it is not obvious to us that the "one-line diagrams" that OPC seeks raise the same security concerns as substation maps (though perhaps this is obvious to the Commission, whose staff we assume has experience with such diagrams).

**24.** We emphasize that nothing in this opinion should be construed as diminishing the discretion of the Commission, should it deter-

We vacate Commission Orders 15381, 15989, 15915, and 16066, and remand with an instruction that the Commission (1) determine, in light of the relevant factors identified in this opinion, and such other relevant factors as the Commission may identify, whether orders precluding OPC from obtaining copies as requested of the maps and diagrams in issue, and limiting OPC to inspection of the documents in Pepco's offices, are necessary to protect the documents from disclosure to the public (or whether, instead, the Confidentiality Agreement or some other terms restricting which individuals may have access to the maps and diagrams, or restricting use and disclosure of the documents, are appropriate to maintain the confidentiality of the documents); and (2) explain the basis for its determination.

*So ordered.*

mine that some restriction beyond the Confidentiality Agreement is necessary to protect the maps and diagrams from public disclosure, to choose which among various alternatives is or are the appropriate restriction(s). Nor do we cabin the Commission's discretion regarding whether to conduct an *in camera* review of the maps and diagrams, as OPC contends the Commission was obliged to do before ruling on the motions to compel, or whether to hold an evidentiary hearing before announcing its rulings on remand. Like the Commission, we know of no "judicial precedent that requires [it] to condition its protective order on an evidentiary hearing" in every case, instead of, for example, on affidavits or proffers from the parties' counsel. *Cf. Johnson*, 398 A.2d at 364 (explaining that a "trial court's exercise of discretion on certain questions may require no factual inquiry ... because ... the attorney's offers of proof will be an adequate foundation"). Whether a hearing is required depends upon whether there are factual disputes to be resolved.